*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0042p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ROBERT KENNEDY,

        *Plaintiff-Appellee,*

    *v.*

CITY OF CINCINNATI, et al.,

        *Defendants,*

JEFFREY ZUCKER, Police Officer; DAVID HUDEPOHL,

        *Defendants-Appellants.*

No. 09-3089

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 07-00512—Timothy S. Black, Magistrate Judge.

Argued: December 3, 2009

Decided and Filed: February 16, 2010

Before: GRIFFIN and KETHLEDGE, Circuit Judges; CARR, Chief District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Peter J. Stackpole, CITY OF CINCINNATI, OFFICE OF CITY SOLICITOR, Cincinnati, Ohio, for Appellants. Steven F. Stuhlbarg, LAW OFFICE, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Peter J. Stackpole, CITY OF CINCINNATI, OFFICE OF CITY SOLICITOR, Cincinnati, Ohio, for Appellants. Steven F. Stuhlbarg, LAW OFFICE, Cincinnati, Ohio, for Appellee.

_____

[*]The Honorable James G. Carr, Chief United States District Judge for the Northern District of Ohio, sitting by designation.

1

———————————

## OPINION

———————————

GRIFFIN, Circuit Judge.  Defendants Jeffrey Zucker and David Hudepohl appeal the denial of their motion for summary judgment based on the defense of qualified immunity from plaintiff Robert Kennedy's procedural due process claims brought under 42 U.S.C. § 1983.  For the reasons that follow, we reverse in part and affirm in part.  In doing so, we hold that Kennedy did not have a protectable property interest in his $10 City pool token, but possessed a clearly established constitutionally-protected liberty interest not to be banned from all City recreational property without procedural due process.

I.

The City of Cincinnati, through the Cincinnati Recreation Commission ("CRC"), operates swimming pools and recreation facilities.  "Recreation programs and facilities are open to all citizens regardless of race, gender, color, religion, nationality, sexual orientation or disability." (alteration in emphasis.)  The City offers access to its swimming pools by issuing pool tokens, which cost $10.  Pool tokens, however, are not issued automatically.  The City retains "discretion to refuse to issue a token depending on circumstances[,]" and must refuse to issue a pool token for the following seven reasons:

[1.]  The City may not issue a token to a person suspected of having an infectious or communicable disease.

[2.]  The City may not issue a token to a person with head lice or ringworm.

[3.]  The City may not issue a token to a person with an obvious infectious wound.

[4.]  The City may not issue a token to a sex offender.

[5.]  The City may not issue a token to a known violent or dangerous person.

[6.]    The City may not issue a token to persons known to have violated pool rules in the past.

[7.]    The City may not issue a token to a person who is obviously high or intoxicated.

When a pool token is issued, the new member completes and signs a membership card, which states:

I agree to follow the rules and policies and procedures of the Cincinnati Recreation Commission.  I understand that my membership may be revoked without a refund if I do not follow the rules.

"[M]embership card[s] [are] kept at the pool where the new member purchased the token" and "contain[] the identifying number of the token that was purchased."  The tokens are not transferable and may not be used by more than one person.

The CRC's rules, policies, and procedures in effect during the relevant time period are contained in the CRC Aquatic Division Program Brochure 2007.  The rules provide that the CRC "has the responsibility to provide a clean, pleasant, and safe environment for public swimming."  Because "[s]ituations may occur that require immediate corrective action[,]" the CRC grants lifeguards "full authority to act in order to ensure the safety of swimmers."  The Brochure also contains a list of "General Facility Rules," including the following: "Only adults supervising children are permitted inside [the] pool area wearing street clothes, and should remain back near the fence, not up by the pool."

During 2007, Jeff Brokamp was the principal of Mt. Washington Elementary School, which is located next to Mt. Washington pool.  For two days in "April or May" of 2007, Kennedy allegedly was "staring" at children at the elementary school during a field day.  The children and teachers felt "uncomfortable" with Kennedy "standing very close" to them.  Therefore, the teachers sent two students into the school building to inform Brokamp of the situation and their discomfort.  Brokamp followed the students into the field, watched Kennedy for a "few seconds[,]" and then approached and introduced himself.  Brokamp spoke with Kennedy for a "few minutes" and asked him

to move away from where the children were playing. Kennedy subsequently left the area.

Ann Couzins was the pool manager for Mt. Washington pool in 2007. According to Couzins, Mark Celsor, the director of the Mt. Washington Recreation Center, had asked her to "keep an eye on" Kennedy even before he joined the pool because of the incident that occurred at Mt. Washington Elementary School. This request was also made by pool supervisor and defendant David Hudepohl, who asked Couzins "to go ahead and keep an eye on him" and to maintain a log of Kennedy's actions. Couzins testified that for "four or five days in a row" she saw Kennedy "just standing outside the gate watching the pool and looking at the kids." She described his behavior as "a little bit strange."

In June 2007, Kennedy purchased a pool token from the CRC for $10. During June, Kennedy frequently used the pool token to visit the CRC operated pool in the neighborhood of Mt. Washington. As instructed, Couzins kept a record of the pool staff's observations of Kennedy. Couzins did not personally see Kennedy interacting with any of the children at the pool but noted the observations of the other lifeguards. She testified that "all" of the lifeguards "observed [Kennedy] . . . at the pool watching the kids[,]" and that they "all felt uncomfortable around him[.]" Couzins specifically described how lifeguard Jenny Sallee saw Kennedy "trying to . . . throw a ball with [a boy] or follow him into the woods[.]"[1] "[M]ultiple parents at the pool" also approached Couzins to communicate "that they felt uncomfortable with [Kennedy's] presence" at the pool.

On June 20, 2007, Kennedy watched a swim meet at the pool. Tamara Kluckman-Gory, a teacher at the Hamilton County Justice Center, noticed Kennedy observing the meet with a "fixed smile, fixed kind of a scary smile." Kluckman-Gory testified that mothers were concerned that Kennedy was staring at the children, and she had heard that there was worry that "somebody at the pool . . . could be a pedophile[.]"

---

[1] The boy and his mother lived in Kennedy's apartment building.

She decided to "confront[]" Kennedy and walked over to speak with him. After exchanging pleasantries, Kluckman-Gory informed Kennedy that he was "kind of creeping some people out." Thereafter, Kennedy "mumbled something" and left the pool area.

On June 21, 2007, Kennedy arrived at the pool and sat on a bench approximately six feet from it. Kennedy was wearing a shirt, shorts, and sandals; he wore a swimsuit beneath his shorts. Hudepohl observed Kennedy reading a newspaper, but suspected he was actually watching children in the pool.

Hudepohl called his supervisor, Jincey Yemaya, who instructed Hudepohl to contact the police. Hudepohl called the police and asked that Kennedy be investigated "because he was removed from the playground for lurking and staring at young kids during recess and . . . was seen by guards following children back into the woods."[2] Cincinnati Police Officers Christine Smith and Jeffrey Zucker arrived in the Mt. Washington School parking lot, where they were met by Hudepohl. Hudepohl informed the officers that: (1) Kennedy was wearing street clothes in violation of CRC rules and regulations;[3] (2) he had been "lurking along the fence line" and not swimming in the pool area; (3) parents had expressed concerns regarding Kennedy's behavior; (4) the principal from Mt. Washington Elementary School had banned Kennedy from "Olympic day"; and (5) Kennedy had been seen at a swim meet, standing at the fence watching children.

Thereafter, the officers approached Kennedy in the pool area, accompanied by Hudepohl. Zucker questioned Kennedy for approximately fifteen minutes, during which time Zucker informed him that the officers were there "as a precaution" because people

---

[2]The police report indicates that the police received a statement that a 44-year-old, white male, 6'0, wearing a blue and white floral shirt and brown shorts had been seen "following the kids into the woods, daily, [for] a wk & has been kicked out [several] times, [for] lurking[.]"

[3]Kennedy argues that this fact "is irrelevant, for it is undisputed that Mr. Kennedy's clothing is not the reason why Mr. Kennedy's pool pass was confiscated, and is not the reason he was ordered off of CRC property permanently." Moreover, Hudepohl testified that, while he has consistently approached other individuals for violating this rule and has asked them not to return to the pool wearing street clothes, he has never reported them to the police or banned them from the pool.

were concerned Kennedy was "child watching." While Zucker spoke with Kennedy, Smith queried her computer to check whether Kennedy had any outstanding warrants or whether he was listed as a sexual predator in Hamilton County. From her search, Smith determined that Kennedy was not listed as a sexual predator and had no current warrants. Zucker asked a few more questions regarding why Kennedy was at the pool, and then terminated his investigation because his "basis for any reasonable suspicion to stop Mr. Kennedy had ceased, because [he] had no crime that [he] could verify had been committed, nor could [he] identify one that [was] being committed or [was] going to be committed." The officers subsequently asked Hudepohl how he wanted to proceed.

Hudepohl informed the officers that Kennedy would be banned from Mt. Washington pool for the rest of the season, and that he would like the officers to retrieve the pool token from Kennedy. Thereafter, Zucker approached Kennedy and told him that Hudepohl, acting as an agent of CRC, was requesting that Kennedy surrender his pool pass. In addition, Zucker informed Kennedy that Hudepohl was barring him from "CRC property in Mt. Washington, i.e., the ball fields and the pool area, as well as Mt. Washington School."[4] In response, Kennedy surrendered his pool pass and apparently left Mt. Washington pool without incident.

On February 14, 2008, Kennedy filed an amended complaint in the Southern District of Ohio, alleging that defendants Zucker, Hudepohl, and the City of Cincinnati violated his constitutional rights by confiscating his property, and by restricting his liberty, without due process of law.[5] In addition, Kennedy pleaded a state law claim of defamation, contending that Hudepohl defamed him by falsely implying that he had engaged in serious sexual misconduct. On October 16, 2008, defendants moved for summary judgment, arguing that they were entitled to qualified immunity because

_____

[4]Kennedy asserts that he was banned from "all municipal land and facilities operated by the Cincinnati Recreation Commission[,]" not just the CRC grounds located in Mt. Washington. He supports this claim with his affidavit, the testimony of Officer Smith that Zucker typed a computer entry stating that Kennedy was "banned from CRC property," and a copy of the incident report stating Kennedy was "banned from CRC properties[.]"

[5]Kennedy filed his first complaint on July 2, 2007, but did not name Hudepohl as a defendant at that time. In addition to adding Hudepohl as a defendant in his amended complaint, Kennedy also dismissed his claims against Smith, who was named as a defendant in the original complaint.

Kennedy failed to show that his clearly established rights were violated. On January 12, 2009, the district court granted summary judgment for the City of Cincinnati but denied summary judgment for Zucker and Hudepohl, finding that "access to the public pools constitutes a cognizable property interest" and that genuine issues of material fact exist as to what process Kennedy was afforded regarding the revocation of his pool pass.[6]

Defendants Zucker and Hudepohl filed this interlocutory appeal on January 21, 2009.

## II.

We must first consider whether we have jurisdiction to address defendants' interlocutory appeal. 28 U.S.C. § 1291 limits our jurisdiction to "final decisions of the district courts of the United States . . . ." *Id.* "A district court's denial of qualified immunity is an appealable final decision under 28 U.S.C. § 1291, but only 'to the extent that it turns on an issue of law.'" *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). A defendant raising a qualified immunity defense "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995); *see also Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) ("A defendant who is denied qualified immunity may file an interlocutory appeal with this Court only if that appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law."). Nevertheless, that the district court here denied defendants' motion for summary judgment on the ground that genuine issues of material fact exist does not necessarily preclude our jurisdiction over defendants' appeal. Rather, we have recognized that, "*regardless of the district court's reasons* for denying qualified immunity, we may exercise jurisdiction over the . . . appeal to the extent it raises questions of law." *Williams v. Mehra*, 186 F.3d 685, 689-90

---

[6]The City of Cincinnati was dismissed as a defendant by the district court pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

(6th Cir. 1999) (en banc) (internal quotation marks and citation omitted); *see also Turner v. Scott*, 119 F.3d 425, 428 (6th Cir. 1997).

As we recognized in *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007):

> Language in our earlier decisions interpreting *Johnson* suggests that where, as here, the appellant fails to concede the facts as alleged by the appellee, this court is completely deprived of jurisdiction over the appellant's interlocutory appeal. *See Berryman*, 150 F.3d at 563 ("If . . . the defendant disputes the plaintiff's version of the story, the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal."). Subsequent cases, however, have rejected that approach and clarified that we may consider a pure question of law, despite the defendants' failure to concede the plaintiff's version of the facts for purposes of the interlocutory appeal: "If . . . aside from the impermissible arguments regarding disputes of fact, the defendant also raises the purely legal question of whether the facts alleged . . . support a claim of violation of clearly established law, then there is an issue over which this court has jurisdiction." *Estate of Carter*, 408 F.3d at 310 (internal quotations and citation omitted); *see also Smith v. Cupp*, 430 F.3d 766, 772 (6th Cir. 2005); *but see McKenna v. City of Royal Oak, et al.*, 469 F.3d 559, 561 (6th Cir. 2006) (holding this court lacks jurisdiction to consider interlocutory appeal where appellant relies solely on disputed facts).

We therefore conclude that we have jurisdiction to consider whether, accepting as true the facts alleged by Kennedy, defendants are entitled to qualified immunity from Kennedy's claim of a due process violation. *See Mehra*, 186 F.3d at 689-90 (instructing that this court has jurisdiction to consider whether facts, as alleged by plaintiff, entitle defendant to summary judgment); *Berryman*, 150 F.3d at 562 (same).

### III.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. XIV § 1. For Kennedy to prevail on his procedural due process claim, he must show that he was deprived of a constitutionally-protected property or liberty interest and that the deprivation occurred without due process. *Zinermon v.*

*Burch*, 494 U.S. 113, 125 (1990).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must, instead, have a legitimate claim of entitlement to it."  *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  Because he paid $10 to purchase the pool token, Kennedy claims he has "an enforceable entitlement to the token," which amounts to a property interest deserving of due process protection.  Although the parties dispute whether revocation of Kennedy's pool pass was meant to ban him only from Mt. Washington grounds or from all CRC properties, as noted above, we must assume as true all facts alleged by plaintiff.

However, even assuming that Kennedy was banned from all CRC properties that were generally open to the public, Kennedy cites no Ohio authority establishing a right to enter CRC properties or a constitutionally-protected property interest in his pool pass. *See Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006) (explaining that the question of whether a constitutionally-protected property interest exists is often a question of state law).  Kennedy's reliance upon three cases in which the United States Supreme Court or this court found a cognizable property interest is misplaced because those cases involved significant interests related to an individual's ability to engage in an occupation or to provide sustenance to his family.  *See Barry v. Barchi*, 443 U.S. 55, 64 (1978) (a horse trainer has a cognizable property interest in a horse trainer's license sufficient to invoke the protection of the Due Process Clause); *Dixon v. Love*, 431 U.S. 105, 112 (1977) ("Due Process Clause applies to the deprivation of a [truck] driver's license by the State[.]"); *Banks v. Block*, 700 F.2d 292, 297 (6th Cir. 1983) (food stamp recipients have a cognizable interest in benefits during their unexpired certification period).  These heightened interests are clearly distinguishable from a $10 recreational pool pass.

In this regard, the Supreme Court has recognized that, "[the] range of interests protected by procedural due process is not infinite."  *Ingraham v. Wright*, 430 U.S. 651, 672 (1977) (internal quotation marks and citation omitted).  A protected property interest generally "must be more than [a] *de minimis*" interest.  *Omosegbon v. Wells*, 335 F.3d 668, 674 (7th Cir. 2003).  *See*, *e.g.*, *Laney v. Farley*, 501 F.3d 577, 584 (6th Cir. 2007)

(finding "a one day in-school suspension to be a *de minimis* deprivation"); *Gillard v. Norris*, 857 F.2d 1095, 1098 (6th Cir. 1988) (finding a police officer's three-day suspension from work to be a de minimis deprivation of property not deserving of due process protection). Here, although Kennedy arguably had a property interest in his $10 pool pass of which the City deprived him, "the nature of [that] interest" is de minimis when viewed against the background of reason, Supreme Court case law, and this court's past decisions. *Roth*, 408 U.S. at 571. Accordingly, we hold that Kennedy did not have a property interest "sufficient to invoke the procedural protections of the Due Process Clause." *Meachum v. Fano*, 427 U.S. 215, 224 (1976).

IV.

Kennedy next claims his ban from CRC properties deprived him of his liberty interest to enter certain public spaces, as guaranteed by the Due Process Clause of the Fourteenth Amendment. In *City of Chicago v. Morales*, 527 U.S. 41 (1999), the United States Supreme Court addressed Chicago's "Gang Congregation Ordinance," which prohibited "criminal street gang members" from "loitering" in public places. *Id*. at 45-46 (internal quotation marks omitted). In addressing the overbreadth doctrine, Justice Stevens, writing for the plurality, stated:

> [T]he freedom to loiter for innocent purposes is part of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment. We have expressly identified this "right to remove from one place to another according to inclination" as "an attribute of personal liberty" protected by the Constitution. *Williams v. Fears*, 179 U.S. 270, 274 (1900); *see also Papachristou v. Jacksonville*, 405 U.S. 156, 164 (1972). Indeed, it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is "a part of our heritage[,]" *Kent v. Dulles*, 357 U.S. 116, 126 (1958), or the right to move "to whatsoever place one's own inclination may direct" identified in Blackstone's Commentaries. 1 W. Blackstone, Commentaries on the Laws of England 130 (1765).

*Id.* at 53-54 (footnotes omitted). *See also Anthony v. Texas*, 209 S.W.3d 296, 307-08 (Tx. Ct. App. 2006) (holding plaintiff "clearly had a liberty interest [to enter a public] park.").

Assuming that Kennedy's version of the facts are true, defendants have barred Kennedy from entering any property deemed a part of the City of Cincinnati's recreational system, which presumably encompasses more than its public pools, and certainly encompasses more than Mt. Washington pool.  "The City's action is reminiscent of a partial banishment, which serves to expel [Kennedy] from certain portions of City property[.]" *Doe v. City of Lafayette*, 377 F.3d 757, 780 (7th Cir. 2004) (en banc) (Williams, J., dissenting) (citing *Smith v. Doe*, 538 U.S. 84, 98 (2003)) (discussing banishment as a measure historically recognized as punishment).  Thus, it is clear that Kennedy had a liberty interest "to remain in a public place of his choice" and that defendants interfered with this interest.  *Morales*, 527 U.S. at 54.

## V.

At oral argument, Kennedy's counsel conceded that his client had not sufficiently alleged a  procedural due process claim against Hudepohl.  In light of this concession, we reverse the part of the district court's order denying Hudepohl qualified immunity on the alleged constitutional violation of Kennedy's due process rights.  Kennedy's state law claim of defamation against Hudepohl was not raised in this interlocutory appeal and may proceed in the district court.  Thus, below we limit our discussion to the part of the district court's order denying Zucker qualified immunity.

## VI.

"We review the denial of summary judgment on grounds of qualified immunity *de novo* because application of this doctrine is a question of law."  *McCloud v. Testa*, 97 F.3d 1536, 1541 (6th Cir. 1996).  "The doctrine protects all but the plainly incompetent or those who knowingly violate the law." *Dorsey v. Barber,* 517 F.3d 389, 394 (6th Cir. 2008) (internal quotation marks and  citations omitted).  When the defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to such immunity.  *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

"Through the use of qualified immunity, the law shields 'government officials performing discretionary functions . . . from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). In determining whether a defendant is entitled to qualified immunity, the court makes two inquiries: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right[,]" and (2) was the right clearly established to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Although *Saucier* mandated that these questions be addressed in order, that requirement has since been relaxed. *See Pearson v. Callahan*, — U.S. — , 129 S. Ct. 808, 818 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").

Here, after Zucker questioned Kennedy for approximately fifteen minutes, he determined that his "basis for any reasonable suspicion to stop Mr. Kennedy had ceased, because [he] had no crime that [he] could verify had been committed, nor could [he] identify one that [was] being committed or [was] going to be committed." Zucker informed Hudepohl of this fact, but Hudepohl still asked Zucker to confiscate Kennedy's pool pass and to order him off the premises. Zucker fully complied with this request, and, arguably, ordered Kennedy to not enter *any* CRC property for an indefinite period of time.

Zucker avers that he should be immune from suit because he was following the orders of Hudepohl, an agent of the municipal pool. However, "since World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order." *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 n.5 (11th Cir. 2004) (internal quotations marks and citation

omitted). Regardless of the authority Hudepohl possessed, Zucker was not "relieve[d] . . . of his responsibility to decide for himself whether to violate clearly established constitutional rights[.]" *Id.* at 1210. "[U]nder the Supremacy Clause, public officials have an obligation to follow the Constitution even in the midst of a contrary directive from a superior or in a policy." *N.N. ex rel. S.S. v. Madison Metro. Sch. Dist.,* — F. Supp. 2d —, 2009 WL 4067779, at *6 (W.D. Wis. Nov. 24, 2009). *See, e.g., Glasson v. City of Louisville*, 518 F.2d 899, 903-04 (6th Cir. 1975) (officer that was following police chief's order was not immune from suit). Thus, viewing the facts alleged in the light most favorable to Kennedy, we conclude that Zucker violated Kennedy's constitutional rights by banning him from all City recreational property without due process of law.

We must therefore determine whether Kennedy's right to lawfully remain in public spaces was clearly established. "[I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself." *Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988). Yet, to be "clearly established" there need not be a prior case deciding that "the very action in question has previously been held unlawful[.]" *Anderson*, 483 U.S. at 640. In *McCloud*, we noted that if courts required prior precedent on the specific facts at issue in the pending case, "qualified immunity would be converted into a nearly absolute barrier to recovering damages against an individual government actor. . . ." *McCloud*, 97 F.3d at 1557. "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question[.]" *United States v. Lanier*, 520 U.S. 259, 271 (1997).

It is apparent that Kennedy had a clearly established right to remain on public property based on the Supreme Court's holdings in *Fears*, 174 U.S. at 274, *Papachristou*, 405 U.S. at 164, *Kent*, 357 U.S. at 126, and *Morales*, 527 U.S. at 53-54. "[T]he preexisting law was sufficient to provide the defendant with 'fair warning' that

his conduct was unlawful." *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000) (quoting *Lanier*, 520 U.S. at 270-71). Any competent government official, particularly a police officer, should have realized that he cannot deprive a person, who has not committed a crime or violated some regulation, nor was likely to do so, of access to public grounds without due process of law. Therefore, we hold that for purposes of defendants' motion for summary judgment, Kennedy possessed a constitutionally-protected liberty interest to use municipal property open to the public and that depriving him of his liberty interest, without procedural due process, constituted a violation of a clearly established constitutional right.[7]

## VII.

For these reasons, we affirm in part, and reverse in part, the judgment of the district court, and remand for further proceedings consistent with this opinion.

---

[7]As the district court noted, "entry of judgment regarding qualified immunity must await the jury's resolution of the disputed facts as to the process afforded." Moreover, the scope and duration of Kennedy's ban from CRC grounds, as well as whether or not the facts support a revocation for good cause under the pool's rules, remain in dispute. Therefore, the trier of fact will need to resolve these genuine issues of material fact before a final determination regarding qualified immunity can be made.