Joseph ZULOCK, Plaintiff–Appellee,

v.

Thomas SHURES, Defendant–Appellant.

No. 08–4664.

United States Court of Appeals,
Sixth Circuit.

Dec. 22, 2010.

Before: DAUGHTREY, SUTTON, and McKEAGUE, Circuit Judges.

## OPINION

McKEAGUE, Circuit Judge.

Joseph Zulock sued Police Officer Thomas Shures, Detective Frank Hensley, and the City of Middletown, Ohio, pursuant to both 42 U.S.C. § 1983 and Ohio law after Shures shot Joseph Zulock while investigating whether Zulock had been involved in a "hit-skip" car accident. The district court granted summary judgment to the defendants on many of the claims, but—despite Shures's argument that he was protected from suit by qualified immunity—denied Shures's motion for summary judgment as to Zulock's claims for excessive force and illegal arrest. We now affirm.

## I.

On May 8, 2006, Joseph Zulock was involved in a minor traffic accident. While Zulock drove away without stopping, the other driver provided the license plate number of the fleeing vehicle (along with a description of the vehicle and of the driver) to Thomas Shures, a patrol officer for the Middletown Police Department who had been dispatched to investigate the accident. Shures used the license number to identify Zulock as the owner of the vehicle and to find Zulock's address, at 608 Young Street in Middletown. Zulock, meanwhile, who had been drinking at the Eagles Lodge in Springboro, Ohio until around 7:00 PM, had arrived back at the house, informed his mother, Mabel Zulock, that the police might come looking for him, and begun to make some food. Shures in turn arrived at Zulock's address at approximately 8:30 PM, where he found Zulock's car, with the engine still warm, parked in the street. Shures then walked onto the porch, opened the swinging screen door, and knocked on the front door of the house.

The house at 608 Young Street, which was owned by Mabel Zulock, is a two-story single-family residence. The house is fronted by a raised porch; the entry, which includes both a screen door and an interior wooden door, is on the left side of the porch as one faces the house. The screen door swings open and out to the right; the interior door opens inward to the right. There is dispute as to whether

the screen door swings shut and latches automatically. Inside the front door is a foyer, and just beyond the foyer is the open passageway to the kitchen. A built-in counter with cabinets runs along the back wall. As one stands in the foyer and faces the back wall of the kitchen, one sees a kitchen table on the left side of the kitchen and a stove on the right. The foyer is 13 feet, 7 inches deep. The distance from the front door to the point at the back of the kitchen where the cabinets meet the floor is 24 feet, 2 inches.

After Shures knocked, Mabel Zulock opened the door. Shures asked for Zulock, and Mabel Zulock either told Shures that Zulock was her son and the owner of the vehicle, or else motioned to the kitchen in the back of the house. Shures either remained in the doorway or (in his own version) entered the house without permission, walking by Mabel Zulock to do so. Given the layout of the house, Shures, regardless of whether he was standing in the doorway or had entered the house, could see through the foyer directly into the kitchen, where the 6 foot 4 inch, 225 pound Zulock was standing holding a 10–inch serrated bread knife with a forked tip. It is as this point that Shures's version of events and Zulock's version of events begin to diverge.

## A. Shures's Version of Events

According to Shures, who did not initially see the knife when he first spotted Zulock, he said "Sir I need you to step outside of the house here so I can talk to you about the car accident that occurred earlier today." (R. 37 Ex. 2, Crim. Trial Tr. (CTT) 76.) Zulock turned toward Shures, and Shures noticed that Zulock was carrying the knife. Zulock pointed the knife at Shures and replied "Fuck you." Shures then placed his hand on his gun and, in a "command type voice," ordered Zulock to drop the knife. Zulock responded aggressively, turning to face Shures, squaring up his shoulders and body and lowering his head; Zulock "was kind of looking out from underneath his eyebrows and just had sort of a menacing disposition." (CTT 77–78.)

Shures testified that at this point he was approximately 10–12 feet from Zulock, who was still in the kitchen. (Shures had been trained that, as a general rule, in facing an individual armed with a knife he needed at least twenty-one feet between himself and the knife-armed assailant in order to have time to draw his weapon from its holster and fire two bullets.) Shures drew his firearm and held it down by his side, and again commanded Zulock to drop the knife; in response, Zulock said "Fuck you, motherfucker. Kill me." Shures pulled Mabel Zulock onto the porch and out of the way, pointed his weapon at Zulock, and repeated yet again his command for Zulock to drop the knife. Zulock finally complied, and placed the knife on the kitchen table.

Once Zulock had put down the knife, Shures ordered Zulock to come closer to the entrance to the house so that Shures could secure Zulock. Zulock complied, but "was still being a little bit combative" and was "trying to argue with" him, and was saying "something about making a sandwich or something along those lines." (CTT 85–86) "[H]e seemed angry and had his jaw clenched and his brow furrowed," Shures later testified. (CTT 86.) Shures "had [Zulock] turn around, face away from [Shures], and place his hands on top of his head." (CTT 81.) At this point, Zulock was "probably about a foot, foot and a half away at the most." (R. 36 Ex. 1, Suppress. Hr'g Tr. (SHT) 16.) Not more than "a second or two" passed between the time Zulock put down the knife and the

time Shures stood behind Zulock while Zulock placed his hands on top of his head.

As Shures placed his weapon in its holster and began to withdraw his handcuffs in order to secure Zulock, Zulock said "Fuck this," "ran back over to the table to where the knife was, grabbed the knife in his right hand and with the blade projecting out of the bottom of his fist, turned towards [Shures] and charged at [Shures]." (CTT 82–83.) As Shures testified during the preliminary hearing to determine whether Shures had probable cause to arrest Zulock for felony assault, "[a]s I approached him to secure him in my handcuffs, he ran back over grabbed the knife, lifted it over his head and came at me with it." (R. 35 Ex. 1, Prelim. Hr'g Tr. (PHT) 3–4.) Shures took three steps backward toward the front door, and then, as Zulock continued to charge, Shures fired three shots, hitting Zulock once. "[Zulock] kept coming towards me after those shots," Shures testified. "And it wasn't until I fired the third round that he was knocked off balance and fell down." (CTT 106.) According to Shures, "less than a second" elapsed from the moment Zulock said "Fuck this" until Shures shot Zulock. Zulock fell to the ground on his back; Office Shures called for a paramedic and, securing Zulock's hands with the handcuffs, placed Zulock under arrest for felony assault on a police officer—though he did not tell Zulock that was why he was being arrested.

## B. Zulock's Version of Events

Joseph Zulock's version of events differs from Shures's in several critical respects. According to Zulock, when Shures entered 608 Young Street, Zulock was standing in the kitchen, probably 12 to 15 feet (but perhaps 18–20 feet) away from the front door, using a knife to open a package of hot dogs. "I was cooking, getting ready to cook," Zulock later recounted. "Then the next thing I know he is yelling for me to put the knife down, and I turned around and gave him a smart remark that I couldn't cook in my own kitchen and all this. Then I finally laid the knife on the table." (R. 45 (Zulock Dep.) 48.) Zulock told Shures "fuck you" four or five times during the confrontation "because [Zulock] didn't like the tone of voice [Shures] was using towards [him]." (Zulock Dep. 51–52.)

Having placed the knife on the table, Zulock started to turn toward Shures, but suddenly remembered that his girlfriend's young grandson, who was playing next door, might return to the house and play with a knife left in that position. Zulock, who was facing the kitchen table but turning toward Shures, therefore picked up the knife, intending to put it back behind the kitchen sink, and turned away from Shures to do so, taking a half-step or a step toward the back of the house. Shures, seeing Zulock pick up the knife, then said "I said put the fucking knife down." Zulock glanced over his left shoulder, and said "[w]hat, are you going to kill me for cooking?"[1] (CTT 222, 219.) It was at this moment, as Zulock was turning *away* from Shures and looking back over his shoulder, that Shures fired his three shots. Zulock was hit by a single bullet, which, he testified "went in the back of my shoulder and out my collarbone, back of my left shoulder and out my collarbone." (Zulock Dep. 58.)

---

1. In his deposition, Zulock agreed that turning, picking up the knife, turning back, and being shot was "pretty much an instantaneous action." In this version of the event—which does not fully explain how Zulock might have come to be shot in the back— Shures and Zulock did not have time to exchange words, and Shures was responding to Zulock picking up the knife.

## C. Other Evidence and the Testimony of Other Witnesses

While much of the factual dispute between Shures and Zulock comes down simply to a question of credibility, there is additional evidence and testimony from eyewitnesses that could support a finding that each version of events is plausible.

Some of the evidence supports Zulock's contention that Shures never left the front doorway of 608 Young Street before the shooting, and that the reported confrontation inside the house as Shures prepared to handcuff Zulock never took place. Eyewitnesses Destry Hogston and Christine Young both testified that from across the street they never saw Shures leave the doorway until after the shooting. The shell casings ejected from Shures's gun, moreover, were found on the porch. If the outer screen door swings shut and latches automatically, this may suggest that Shures was standing in the doorway when he fired the shots, and had *not* advanced into the house, as he claimed in his testimony at Zulock's criminal trial. Shures, in an initial statement to Hensley shortly after the incident—a statement not consistent with Shures's later testimony about entering the house and preparing to secure Zulock—reportedly stated that he had been standing at the threshold of the front door during the entire incident.

There is critical disagreement over the placement of Zulock's wound, and in particular over whether Zulock was shot in the back or on the side of the body, near the shoulder. During the criminal trial, for example, Detective David Shortt, who was responsible for gathering and analyzing the forensic evidence at the scene, testified that the entrance hole in the shirt that Zulock was wearing when shot was located "on the left forward portion of the right arm," with the exit "located on the upper left chest or sternum area right in

this area." (CTT 143.) A doctor who examined Zulock the day after the shooting observed that "[o]n examination, he has anterior entry wound about the shoulder which is bandaged." (R. 46 Ex. 1 at 20.) (In medical terminology, "anterior" refers to the front of the body, while "posterior" refers to the back of the body.) In contrast, a doctor who examined Zulock on the evening of the shooting noted that Zulock "has a circular wound over the posterior trapezius of the mid-clavicle. On the anterior aspect of his chest wall, the clavicle area, is a stellate wound that appears to be the exit wound." (R. 46 Ex. 1 at 24.) Obviously, evidence that Zulock was shot directly in the back would support (though not prove) Zulock's claim that he was turning away from Shures when Shures fired and would call into question the need to use deadly force.

Zulock's memory has varied wildly since the incident. The day after the shooting, for example, he told a police detective (who was one of Shures's co-workers and who had just Mirandized Zulock in the hospital, explaining that Zulock faced several charges) that he had no memory of anything that had occurred between the time he left the Eagles Lodge and the moment he woke up in the hospital. Zulock later explained in a deposition that he could not remember what he told that detective, as "they had me on pain medicine at the time and stuff." (Zulock Dep. 38.) Two days after the shooting, Zulock told Major Mark Hoffman of the Middletown Police Department, who was assigned to investigate Shures's use of force, that he could remember the alcohol and drugs he had taken on the 6th, but could not recall anything about the shooting. In giving his deposition, however, Zulock provided a detailed account of the confrontation. At his criminal trial, moreover, Zulock similarly testified at length and in detail.

Although Shures was *not* aware of Zulock's condition at the time of the incident, on the night of the shooting Zulock was under the influence of alcohol and perhaps also of prescription (or non-prescription) medication. Zulock later claimed that while at the Eagles Lodge that night, he consumed only three beers. After the shooting, however, Zulock's blood alcohol content measured at .236—which, according to a defense expert, could only have resulted from drinking more (and possibly *many* more) than a dozen beers. (Zulock has been told by doctors that he is an alcoholic, but he continues to drink and believes that he is not an alcoholic.) On the day of the shooting Zulock had also ingested two 500 mg Vicodin tablets and at least one anti-depressant tablet.

## D. The Criminal Prosecution and District Court Decision

On May 19, 2006, the Middletown Municipal Court concluded during a preliminary hearing that the state had established probable cause that Zulock had committed felonious assault on a police officer. Zulock was indicted on June 13, 2006, and went on trial in July of 2006. On July 21, 2006, just before the trial, the Butler County Court of Common Pleas denied Zulock's motion to suppress the state's evidence and Zulock's arrest on the basis that Shures illegally entered Zulock's house without consent or exigent circumstances. The jury ultimately found Zulock not guilty.

Having been acquitted on the felony assault charge, Zulock filed numerous claims against Hensley, the City of Middletown, and Shures. On November 26, 2008, the district judge granted both Hensley and the City summary judgment on all claims; she also granted Shures summary judgment as to two of Zulock's claims, but denied Shures's motion for summary judg-

ment as to Zulock's claims for excessive force and illegal arrest. The court focused on what the judge described as disputed material issues of fact between the two parties. "For example," she wrote,

> if Zulock was approximately twenty feet from Officer Shures, and if Zulock did not brandish or point the knife at Office Shures, and if Zulock was turning away from Officer Shures when he was shot in the back of the shoulder, then a reasonable jury could conclude that Officer Shures used excessive force against Zulock in violation of his Fourth Amendment rights.

(District Court Order at 20.) This appeal followed.

## II.

As an initial matter, we consider whether we have jurisdiction over Shures's appeal. Under the collateral order doctrine, we may entertain an interlocutory appeal under 28 U.S.C. § 1291 where a district court has denied summary judgment and the defendant is a public official asserting a defense of qualified immunity. *Mitchell v. Forsyth,* 472 U.S. 511, 525–27, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Harrison v. Ash,* 539 F.3d 510, 521 (6th Cir.2008). However, a defendant who is entitled to invoke a qualified immunity defense "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones,* 515 U.S. 304, 319–20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); *see also Kennedy v. City Of Cincinnati,* 595 F.3d 327, 333 (6th Cir.2010). Nonetheless, *Johnson* does not stand for the proposition that we *necessarily* lack jurisdiction where a district court has identified what it views as a disputed material issue of fact. *Kennedy,* 595 F.3d at 333. "Rather, we have recognized that, 'regard-

less of the district court's reasons for denying qualified immunity, we may exercise jurisdiction over the ... appeal to the extent it raises questions of law." ' *Id.* (quoting *Williams v. Mehra,* 186 F.3d 685, 689–90 (6th Cir.1999) (en banc)). If, "aside from the impermissible arguments regarding disputes of fact, the defendant also raises the purely legal question of whether the facts alleged ... support a claim of violation of clearly established law, then there is an issue over which this court has jurisdiction." *Livermore ex rel. Rohm v. Lubelan,* 476 F.3d 397, 403 (6th Cir.2007) (quoting *Estate of Carter v. City of Detroit,* 408 F.3d 305, 310 (6th Cir.2005)).

We have found such a "purely legal question" to exist whenever a defendant honestly states that for the purposes of the appeal he "does not dispute the facts found by the District Court." *Farm Labor Org. Comm. v. Ohio State Highway Patrol,* 308 F.3d 523, 531 n. 3 (6th Cir.2002). Even if a defendant refuses to concede all of the plaintiffs' facts, moreover, we "still would have jurisdiction to decide the legal question of qualified immunity—i.e., whether assuming the plaintiffs' version of the facts to be true, the plaintiffs have shown a violation of their clearly established constitutional rights." *See v. City of Elyria,* 502 F.3d 484, 490 n. 2 (6th Cir.2007) (quoting *Farm Labor Org. Comm.,* 308 F.3d at 531 n. 3); *see also Kennedy,* 595 F.3d at 333–34. Put another way, even if a defendant who has been denied summary judgment (and so the protection of qualified immunity) continues to contest a plaintiff's facts in such a way as to otherwise preclude jurisdiction under the collateral order doctrine, we nonetheless retain jurisdiction over the legal question of qualified immunity "to the extent that Defendants make" arguments regarding "whether a given set of facts violates clearly established law." *Harris v. City Of Circleville,* 583 F.3d 356, 364 (6th Cir.2009) (citing *Kirby v. Duva,*

530 F.3d 475, 480–81 (6th Cir.2008)). As we observed in *Kirby,*

> That defendants make the occasional factual argument does not ... destroy jurisdiction over the legal issue of whether there was a violation of a clearly established constitutional right.... [T]his court may simply ignore defendants' attempts to dispute plaintiffs' version of the facts, "obviating the need to dismiss the entire appeal for lack of jurisdiction."

530 F.3d at 481 (citing *Estate of Carter,* 408 F.3d at 310); *see also Harris,* 583 F.3d at 364.

██ Both in his brief and at oral argument, Shures explicitly stated that for purposes of appeal, he was conceding the facts viewed in the light most favorable to Zulock. Having made this concession, Shures unquestionably continued to argue against some of Zulock's facts; to the extent he did so, we have no jurisdiction to consider his arguments. In addition to those improper arguments, however, which we simply ignore, Shures several times laid out arguments premised entirely on statements taken from Zulock's own deposition or Zulock's own testimony. Accordingly, we exercise jurisdiction over the legal question of qualified immunity to the extent that Shures made these arguments regarding whether, under the facts viewed in the light most favorable to Zulock, Shures is entitled to the protection of qualified immunity and so summary judgment.

### III.

We must next determine what facts we use in deciding whether Shures is entitled to qualified immunity. On review of a motion for summary judgment, where there have ordinarily been no factual findings by a judge or jury, courts "are required to view the facts and draw reason-

able inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 379, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). In qualified immunity cases "this usually means adopting ... the plaintiff's version of the facts"—or, if not, then rejecting "visible fiction" and instead adopting the facts most favorable to the non-moving party that are not "so utterly discredited by the record that no reasonable jury could have believed" them. *Scott*, 550 U.S. at 379–81, 127 S.Ct. 1769.

While Shures is not always clear about which facts he is conceding, the facts viewed in the light most favorable to Zulock (and so the ones we consider for the purposes of this appeal) include that: (a) after Mabel Zulock opened the door to 608 Young Street, Shures saw Zulock standing in the kitchen at the back of the house, making food and already holding a large bread knife; (b) Shures was standing approximately 18–20 feet away from Zulock; (c) Shures ordered Zulock several times to put the knife down, and Zulock responded by making "smart remarks" about how he was not permitted to cook in his own kitchen and by telling Shures "fuck you" four or five times; (d) Shures, pulling Mabel Zulock out on the porch, drew his weapon, aimed at Zulock, and again ordered Zulock to put down the knife; (e) Zulock finally complied, putting the knife on the kitchen table and turning toward Shures; (f) after a very short pause, Zulock picked the knife up again and turned *away* from Shures, toward the back of the kitchen; (g) as Zulock took one-half step or one step away from Shures, and was looking back over his shoulder, Shures yelled "I said put down the fucking knife" and Zulock responded "what are you going to do, kill me?"; (h) Shures then shot at Zulock three times, with one bullet hitting Zulock

in the back and exiting through Zulock's chest.

## IV.

We now turn to the question of whether Shures is protected by qualified immunity from Zulock's claim for excessive force. As Shures violated a clearly established constitutional right of Zulock's of which any reasonable person would have known, we find that the district court appropriately denied Shures's motion for summary judgment as to this claim.

Qualified immunity recognizes that the public interest is best served when officials can act "with independence and without fear of consequences" so long as their actions do not violate clearly established rights. *Moldowan v. City of Warren*, 578 F.3d 351, 369 (6th Cir.2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). It protects officers from "undue interference with their duties and from potentially disabling threats of liability." *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir.2005). Qualified immunity is more than a mere defense against the claim, but rather serves the more important role of providing immunity from suit. *Phillips v. Roane County*, 534 F.3d 531, 539 (6th Cir.2008) (quoting *Scott*, 550 U.S. 372, 127 S.Ct. 1769).

In interpreting the Supreme Court's test for qualified immunity, Sixth Circuit panels vary in using either a two-part or three-part approach, both of which "can be said to capture the holding" of *Saucier*. *Estate of Carter*, 408 F.3d at 311 n. 2. Under the two-part approach, we determine whether: (1) the facts viewed in the light most favorable to the plaintiff show that a constitutional right has been violated; and (2) the violation involved a clearly established constitutional right of which a

reasonable person would have known. *Id.* at 311 (citing *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151); *Sample*, 409 F.3d at 695–96.[2] Courts may address the prongs of the qualified immunity analysis in whatever order is most useful. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (U.S.2009).

### A. Whether Shures's use of deadly force violated Zulock's constitutional rights

█ In this case, Shures's use of deadly force clearly violated Zulock's constitutional rights. "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). "[W]hether the use of deadly force at a particular moment is reasonable depends primarily on objective assessment of the danger a suspect poses at that moment." *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir.2007). The critical question is whether a reasonable officer in the defendant's position would have had probable cause "to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others." *Id.* (citing *Brosseau v. Haugen*, 543 U.S. 194, 197, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004); quoting *Garner*, 471 U.S. at 11, 105 S.Ct. 1694). Courts are cautioned to judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "The calculus of

reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865. Regardless, the fact that a situation unfolds relatively quickly "does not, by itself, permit [officers] to use deadly force." *Kirby*, 530 F.3d at 483 (quoting *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir.2005)).

In this case, Shures, who had been trained that an officer needed a minimum of 21 feet between himself and a knife-wielding suspect for safety and who was standing approximately 18 or 20 feet away, shot while Zulock: (1) was standing in his own kitchen, holding a cooking knife; (2) had taken no threatening actions other than saying "fuck you" four or five times; (3) had put down the knife in response to commands, but then had turned toward Shures, picked up the knife, turned toward the back of the house, made a "smart remark," and taken one-half step or one step away from Shures. Even given the speed of this encounter, no reasonable officer could think that a man who had done nothing more than swear four or five times and was walking *away* represented an immediate threat of serious physical harm.

### B. Whether the constitutional violation involved a clearly established constitutional right of which a reasonable person would have known.

█ The second prong of the *Saucier* qualified immunity analysis asks whether

---

2. Under the tripartite approach, courts also consider whether "the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Sample*, 409 F.3d at 695–96. The third prong is only "occasionally examined by this court to 'increase the clarity'

of the analysis." *Drogosch v. Metcalf*, 557 F.3d 372, 378 (6th Cir.2009). "In many factual contexts," the *Estate of Carter* court explained, "the fact that a right is 'clearly established' sufficiently implies that its violation is objectively unreasonable." 408 F.3d at 311 n. 2. This is such a case.

the constitutional violation in question "involved a clearly established constitutional right of which a reasonable person would have known." *Sample,* 409 F.3d at 695–96. The right of an individual not to be subjected to the use of deadly force by an officer who lacks probable cause to believe that the individual posed a threat of serious harm to the officer or others has long been clearly established in this circuit. *See Bouggess,* 482 F.3d at 896; *Dickerson v. McClellan,* 101 F.3d 1151, 1162–1163 (6th Cir.1996) ("[A]s early as 1984, this circuit has held that persons have a clearly established right not to be shot unless they posed a threat to a pursuing officer or others."). Even if the situation faced by Shures was entirely novel, where a general constitutional rule (such as the Fourth Amendment's bar on unreasonable seizure) applies with "obvious clarity" to a particular case, factually similar decisional law is not required to defeat a claim of qualified immunity. *United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997); *see also Brosseau,* 543 U.S. at 199, 125 S.Ct. 596 ("In an obvious case, these [generalized constitutional] standards can 'clearly establish' the answer, even without a body of relevant case law."). As the Supreme Court recently noted, "even as to action less than an outrage, 'officials can still be on notice that their conduct violates established law ... in novel factual circumstances.'" *Safford Unified Sch. Dist. v. Redding,* —— U.S. ——, 129 S.Ct. 2633, 2643, 174 L.Ed.2d 354 (2009) (quoting *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). This is one of the "obvious" cases referred to by *Brosseau,* 543 U.S. at 199, 125 S.Ct. 596: no reasonable police officer could believe that he had the constitutional authority to shoot a man who had offered no threat and who was walking away, toward the back of his kitchen.

## V.

We now turn to the more complicated question of whether Shures is protected by qualified immunity from Zulock's claim for unlawful arrest. Whether Shures violated Zulock's constitutional rights against improper seizure—the first *Saucier* prong, 533 U.S. at 201, 121 S.Ct. 2151—depends almost entirely on whether Shures had probable cause to arrest·Zulock. We therefore address only briefly the second *Saucier* prong, whether any constitutional violation, if it occurred, "involved a clearly established constitutional right of which a reasonable person would have known." *Sample,* 409 F.3d at 695–96. The Fourth and Fourteenth Amendment right not to be arrested except upon probable cause is well established, and must surely have been known to a police officer such as Shures. *See Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). This is the sort of "obvious case" in which generalized constitutional standards can "clearly establish" the answer, "even without a body of relevant case law." *Brosseau,* 543 U.S. at 199, 125 S.Ct. 596. Assuming, then, that Shures lacked probable cause for the arrest, it is clear that he is not entitled to the protection of qualified immunity on this claim; we therefore examine whether Shures had probable cause to arrest Zulock.

### A. Whether Zulock is collaterally estopped from litigating probable cause

As a threshold matter, Shures claims that, as an Ohio court determined at a preliminary hearing that Shures had probable cause for the arrest, Zulock is collaterally estopped from arguing otherwise and so satisfying the first *Saucier* prong as to the illegal arrest claim. Federal courts must apply state laws of collateral

estoppel when deciding whether a state court's determination of probable cause at the preliminary hearing has preclusive effect in a § 1983 action. *Haring v. Prosise*, 462 U.S. 306, 313, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983); *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir.2001). Under Ohio law, collateral estoppel applies when: (1) the fact or issue was actually and directly litigated in the prior action; (2) the fact or issue was passed upon and determined by a court of competent jurisdiction; and (3) the party against whom collateral estoppel is asserted was a party in privity with a party to the prior action. *Thompson v. Wing*, 70 Ohio St.3d 176, 637 N.E.2d 917, 923 (1994). The first prong of this analysis is of course critical: "[c]ollateral estoppel precludes relitigation only when the identical issue was actually decided in the former case." *Goodson v. McDonough Power Equip., Inc.*, 2 Ohio St.3d 193, 443 N.E.2d 978, 987 (1983).

Generally, "where a state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action." *Coogan v. City of Wixom*, 820 F.2d 170, 175 (6th Cir.1987), *overruled on other grounds by Frantz v. Vill. of Bradford*, 245 F.3d 869, 874 (6th Cir.2001).[3] Such a state court probable cause determination, however, "has no preclusive effect if there is evidence that the claim of malicious prosecution is based on a police officer's supplying false information to establish probable cause." *Peet v. City of Detroit*, 502 F.3d 557, 566 (6th Cir.2007) (emphasis removed) (citing *Hinchman v. Moore*, 312 F.3d 198, 202–03 (6th Cir.2002)). When a plaintiff claims (and offers evidence suggesting) that an earlier probable cause determination was made on the basis of false information provided by a police officer, the plaintiff is no longer litigating the same fact or issue, and so does not trigger collateral estoppel. *Hinchman*, 312 F.3d at 202–03; *Darrah*, 255 F.3d at 311.[4]

■ Shures testified at the preliminary hearing following Zulock's arrest that he

---

**3.** Even in *Coogan,* however, the court noted that it was *not* holding that "every determination in a preliminary hearing should be given preclusive effect in a subsequent § 1983 action." *Coogan,* 820 F.2d at 175. Observing that "[s]ome preliminary hearings are little more than formalities" and that criminal defendants may choose for strategic reasons not to contest probable cause at a preliminary hearing, the court concluded that it was only where the accused *takes* an afforded opportunity to contest probable cause at a preliminary hearing that the accused should be collaterally estopped from raising probable cause in a later § 1983 action. *Id.* While Zulock's attorney cross-examined Shures at the preliminary hearing, the transcript shows—and Shures himself observes—that Zulock's attorney did not challenge Shures's statements, call witnesses, or "raise any argument ... that false information had been supplied."

**4.** Both *Darrah* and *Hinchman* concerned Michigan law of collateral estoppel, rather than Ohio law. Under Michigan law, issue preclusion applies when: (1) there is identity of parties across the proceedings; (2) there was a valid, final judgment in the first proceeding; (3) the same issue was actually litigated and necessarily determined in the first proceeding; and (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding. *Darrah,* 255 F.3d at 311 (citing *People v. Gates,* 434 Mich. 146, 452 N.W.2d 627, 630–31 (1990)). The differences between Ohio and Michigan collateral estoppel law are not relevant here, as both states incorporate a "same facts or issues" prong. Both *Darrah* and *Hinchman* deal with the "identity of the issues" requirement of Michigan's collateral estoppel law. *Darrah,* 255 F.3d at 311; *Hinchman,* 312 F.3d at 203. Their holdings therefore apply equally to Ohio's requirement that "the fact or issue ... was actually and directly litigated in the prior action," *Thompson,* 637 N.E.2d at 923.

shot and arrested Zulock after Zulock darted away, picked up the knife, and "came at" Shures, who had entered the house to handcuff and secure Zulock. At the criminal trial, however, two witnesses testified that they never saw Shures leave the doorway of Zulock's house during the confrontation. Perhaps more importantly, Detective Hensley testified that Shures initially reported that he never left the threshold. If Shures never in fact left the doorway, then the confrontation Shures claimed took place inside the house—the confrontation that seemingly formed the basis of the probable cause determination—could not have occurred exactly as Shures testified at the preliminary hearing that it had. As we view the facts in the light most favorable to Zulock, it is clear that Zulock has offered evidence suggesting the probable cause finding was based on Shures's misrepresentations at the preliminary hearing. Zulock is thus arguing an issue that has not been previously litigated, and so is not collaterally estopped from litigating probable cause and bringing his claim for illegal arrest.

### B. Whether Shures Had Probable Cause to Arrest Zulock for Felony Assault

Shures argues that the evidence, even viewed in the light most favorable to Zulock, clearly establishes that at the time of the arrest Shures had probable cause to arrest Zulock for felony assault on a police officer. In support of this argument, Shures points to four Ohio cases which, he argues, demonstrate that similar conduct has been found to constitute an attempt to cause physical harm sufficient to support a conviction for felonious assault under Ohio law. In fact, however, these cases describe conduct that was more egregious and threatening than was Zulock's admittedly foolhardy and offensive behavior. *See, e.g., State v. Wiseman,* 2005 WL

1502148, at *1 (Ohio Ct.App. June 27, 2005) (a man held a knife above his head in a stabbing motion and threatened to kill his girlfriend and father); *State v. Schooler,* 2003 WL 22764492, at *1–2 (Ohio Ct. App. Nov. 21, 2003) (a man choked a woman and hit her with a telephone, and then took his pocket-knife and placed it in her ear while holding her hair and threatening to kill her); *State v. Workman,* 84 Ohio App.3d 534, 617 N.E.2d 723, 724 (1992) (a cornered man involved in a foot-chase with police brandished a utility knife and stepped *toward* a police officer); *State v. Zackery,* 31 Ohio App.3d 264, 511 N.E.2d 135, 136 (1987) (a man brandished a knife after approaching a woman on the street and telling her that she would not be hurt if she cooperated). As at the time of the arrest Zulock had taken no threatening actions other than saying "fuck you" four or five times to Shures, Shures did not have probable cause to arrest Zulock for felony assault.

### C. Whether Shures had probable cause to arrest Zulock for other crimes

Shures also argues that even if did not have probable cause to arrest Zulock for felony assault, he *did* have probable cause to arrest Zulock for three other crimes, and is thus protected by qualified immunity from any claim of illegal arrest. We need not address Shures's legal argument that an officer who knowingly wrongfully arrests a suspect is protected by qualified immunity if he can later identify independent probable cause to arrest that suspect for other crimes, as in fact Shures lacked probable cause to arrest Zulock for any one of the three crimes Shures identifies.

Shures first claims that at the time of the arrest he had probable cause to arrest Zulock for a violation of O.R.C.

§ 4549.02, failing to remain at the scene of an accident, which is a misdemeanor under Ohio law. While ordinarily Ohio law authorizes a warrantless arrest for a misdemeanor only where the offense has been committed in the officer's presence, a warrantless arrest for a misdemeanor is valid if the arresting police officer is able to reasonably conclude, from the surrounding circumstances, including admissions by the defendant, that an offense has been committed. *State v. Reymann*, 55 Ohio App.3d 222, 563 N.E.2d 749, 751 (1989). The officer generally may not, however, depend on hearsay testimony alone in so concluding. *Id.* at 751–52. Shures here had only the hearsay statement of the witness who provided a description of Zulock and Zulock's car, the fact that the radiator of that car was still warm, and Zulock's belligerence when Shures attempted to discuss the hit-skip incident. As only the statement of the witness tied Zulock to the hit-skip accident, Shures was barred by Ohio law from arresting Zulock without a warrant for violating O.R.C. § 4549.02. As the suppression hearing judge concluded, "I don't believe that the officer had the right to arrest this defendant, period, on the hit-skip." (SHT 65.)

■ Shures next claims that he also had probable cause to arrest Zulock for failing to comply with the lawful orders of a police officer under O.R.C. § 2921.331 by refusing multiple commands to put down the knife. O.R.C. § 2921.331, however, is irrelevant in this case, as it deals with the failure to comply with the order or signal of a police officer in the context of operating a motor vehicle. *See, e.g., State v.*

*Ratliff*, 2008 WL 5265676, at *4 (Ohio Ct. App. Dec. 18, 2008) ("[A]n essential element to R.C. 2921.331(A) is that the police officer's authority must derive from traffic regulation."); *State v. Redd*, 2004 WL 1949476, at *2 (Ohio Ct.App. Sept. 3, 2004) (holding that while the term "lawful order" is not defined in O.R.C. § 2921.331(A), "it reasonably encompasses the officer's lawful exercise of the authority to which the section refers: the direction, control, or regulation of traffic.").[5] While Shures came to Zulock's door to investigate a hit-skip accident, Shures's command for Zulock to drop a bread knife that Zulock was holding in his own kitchen cannot be construed as a "lawful order" within the meaning of the O.R.C. § 2921.331—and so Shures could not have had probable cause to arrest Zulock for violating the statute.

■ Finally, Shures claims that he also had probable cause to arrest Zulock for disorderly conduct under O.R.C. § 2917.11, as Zulock caused "inconvenience, annoyance, or alarm" to another by engaging in "violent or turbulent behavior". O.R.C. § 2917.11(A)–(A)(1). Ohio courts have determined that officers had probable cause to arrest under this statute when an individual's "profane language was specifically and intentionally directed at the police officers" and was "coupled with [that individual's] conduct of advancing towards the officers after repeatedly being told to stop and desist." *State v. Rajeski*, 2003 WL 21257968, at *1–2 (Ohio Ct.App. June 2, 2003). Even absent any violent or aggressive action by the person being arrested, moreover, officers have probable cause to

5. While *Ratliff* and *Redd* have been designated as "unreported" opinions, under rules adopted on May 1, 2002, the Ohio Supreme Court abolished the distinctions between " 'controlling' and 'persuasive' opinions of the courts of appeals based merely upon whether they have been published in the Ohio Official Reports." OHIO SUP. CT. R. REP. OPS. 4(A). The Ohio Supreme Court also mandated that "[a]ll court of appeals opinions issued after" May 1, 2002 "may be cited as legal authority and weighted as deemed appropriate by the courts." OHIO SUP. CT. R. REP. OPS. 4(B).

arrest under this statute where an individual "verbal[ly] berat[es]" another individual. *State v. Jackson,* 1998 WL 801367, at *4 (Ohio Ct.App. Nov. 20 1998). It is a stretch, however, to say that Zulock was "verbal[ly] berating" Shures at the time of the arrest. It is an even greater stretch to say that Zulock was taking offensive action by gesturing with the knife he was using to make dinner. Especially given that Zulock was standing in his own kitchen, Zulock's actions do not seem to rise to the level Ohio courts have found to constitute "turbulent" behavior; Shures thus did not have probable cause to arrest Zulock for violating O.R.C. § 2917.11.

### VI.

There are many reasons to doubt or distrust Zulock, including Zulock's wildly variable memory and medically-recorded level of intoxication on the night of the shooting. Ultimately, however, Shures's argument that the district court erred in denying qualified immunity is greatly weakened by the fact that for purposes of appeal Shures must concede Zulock's facts. Whatever actually happened in the kitchen at 608 Young Street on May 8, 2008, a reasonable officer in Shures's position could not have believed that Zulock, who was standing approximately 18–20 feet away, assaulted Shures by: (1) gesturing with a kitchen knife he was using to make dinner; (2) shouting "fuck you" at Shures four or five times; and (3) first putting down the knife and then picking it up suddenly and turning and walking away from Shures. We therefore affirm the district court's ruling, and so return this case to the district court for trial.