*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0162p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JOHN MCGLONE,

        *Plaintiff-Appellant,*

        *v.*

ROBERT BELL; ED BOUCHER; MARK
OCHSENBEIN; MICHAEL LAMBERT,

        *Defendants-Appellees.*

Nos. 10-6055/6169

Appeal from the United States District Court
for the Middle District of Tennessee at Cookeville.
No. 10-00029—Aleta Arthur Trauger, District Judge.

Argued: July 28, 2011

Decided and Filed: April 23, 2012[*]

Before: BOGGS and CLAY, Circuit Judges; TARNOW,[**] District Judge.

———————

## COUNSEL

**ARGUED:** Nathan W. Kellum, ALLIANCE DEFENSE FUND, Memphis, Tennessee, for Appellant. William J. Marett, Jr., OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees. **ON BRIEF:** Nathan W. Kellum, Jonathan A. Scruggs, ALLIANCE DEFENSE FUND, Memphis, Tennessee, for Appellant. William J. Marett, Jr., Blind Akrawi, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees.

———————

[*] This decision was originally issued as an "unpublished decision" filed on April 23, 2012. On May 16, 2012, the court designated the opinion as one recommended for full-text publication.

[**] The Honorable Arthur J. Tarnow, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

_____

OPINION

_____

TARNOW, District Judge.  Appellant is an evangelical Christian who wishes to speak on the campus of Tennessee Technological University (TTU) about his religion. TTU requires non-affiliated individuals and groups to obtain permission before speaking on certain parts of the campus.  TTU employs a fourteen business day advance notice period for all applications.  Appellant attempted to speak on TTU's campus.  When he was denied the opportunity to speak anywhere except the north patio and was removed from campus, Appellant brought an as-applied and facial challenge to TTU's policy in the district court.

Appellant filed a motion for preliminary injunction, and Appellees filed a motion to dismiss.  The district court held that Appellant did not suffer an injury in fact and therefore, did not have standing to bring the suit.  It held that the campus use policy is content-neutral and narrowly tailored.  The district court further granted Appellees' motion to dismiss and denied Appellant's motion for preliminary injunction.

Because Appellant has suffered an injury in fact, has standing, and TTU's policy is not narrowly tailored, we **REVERSE** the district court's finding that Appellant does not have standing to pursue his claims; **REVERSE** the district court's grant of Defendants' motion to dismiss and **REMAND** for further proceedings consistent with this opinion; and **VACATE** the district court's denial of McGlone's motion for preliminary injunction and **REMAND** for further proceedings consistent with this opinion.

**BACKGROUND**

The following facts come from the district court's Memorandum and Order granting Defendants' Motion to Dismiss and denying Plaintiff's Motion for Preliminary Injunction.  The district court accepted as true Plaintiff's version of the facts.  R. 29, at 1-2; Appellant's Br., at 13.

Plaintiff McGlone is a professing evangelical Christian who resides in Breeding, Kentucky. As a tenet of his faith, he conveys his beliefs and convictions to others in public. He does this orally, either in small groups or in one-on-one conversations and through distribution of literature and display of signs. Plaintiff often discusses issues of the day from his religious perspective. To share his faith, the plaintiff frequently visits public universities and expresses his religious beliefs with students and others found on campus. Plaintiff's message relates to the hope that he believes Jesus Christ offers for humanity. In plaintiff's view, there is no better place to share his faith than on a college campus.

The plaintiff makes no attempt to solicit funds or membership in any organization. He does not try to harass anyone or encourage violence, and he expresses himself in a peaceful manner. He claims that he does not try to force anyone to listen to him or to accept the literature he distributes; he seeks only to share his beliefs and to engage other persons in respectful conversation and rational dialogue about the teachings and benefits of Christianity. Tennessee Technological University ("TTU") is a public university located in Cookeville, Tennessee. The TTU campus blends in with the City of Cookeville; other than a few signs, there are no demarcations signifying where TTU ends and the City of Cookeville begins. Various city streets run around and through the TTU campus. The city streets that run through campus include University Drive, Dixie Avenue, North Willow Avenue, and North Peachtree Avenue. TTU's campus is bounded by 12th Street to the north, a railroad to the east, Pine and North Franklin Avenues to the west, and various residences, commercial establishments, and public streets to the south. The sidewalks on the perimeter of the TTU campus and on streets running through campus are indistinguishable from City of Cookeville sidewalks. There are no fences or barricades on the perimeter of the campus to prevent members of the general public from gaining access to the campus. The TTU campus is open to the public at large, and individuals not associated with the university have free access onto the grounds. The campus contains many open, accessible areas on the grounds, including sidewalks, park areas with benches and tables, pedestrian malls, and other public ways.

On April 6, 2009, the plaintiff called TTU to learn how he could express his religious views on campus. He spoke with Susan Henry in the Student Information Office, and she told him to stop by the office when he wanted to speak.[1]

The next day, on April 7, 2009, Mr. McGlone and his friend, Shawn Holes, visited the TTU campus for the specific purpose of

---

[1] It is not clear why Ms. Henry did not mention to Mr. McGlone that there was a written policy applicable to such requests.

expressing a Christian message to students by conversation, literature distribution, and display of signs. McGlone wished to speak in any open, outside area of the campus where students could be found, including but not limited to, the south patio/plaza area outside the University Center, Sherlock Park, the Main Quad near South Hall, and the sidewalks along 12th Street, Dixie Avenue, North Willow Avenue, North Peachtree Avenue, and 7th Street. (Docket Nos. 2-2 through 2-14, Exs. B through O.)

Upon arriving at the TTU campus, McGlone and Holes went to the University Center to meet with Ms. Henry. They noticed a few students on the south patio outside the University Center (Docket No. 2-1, Ex. B) and immediately started talking to them before checking in with Ms. Henry. The south patio has several tables and chairs and flows into a large plaza area. (Docket Nos. 2-2 & 2-3, Exs. C & D.) Students gather in this area, which resembles a pedestrian mall.

After a few minutes, McGlone went inside the University Center to find Ms. Henry, while Holes stayed outside and talked with students. Ms. Henry was not present that day, so McGlone spoke with Mark Ochsenbein, Director of Student Activities. Mr. Ochsenbein said that McGlone could speak on the north patio. (Docket No. 2-15, Ex. P.) McGlone asked if he could use the south patio/plaza instead, there being more students and tables and chairs in that area. Ochsenbein declined McGlone's request and told him that the north patio was his only option. McGlone asked to see the written policy limiting expressive activity to the north patio. Ochsenbein became agitated and said that if McGlone did not use the north patio he would call the university police and have him arrested.

McGlone went outside to inform Holes of Ochsenbein's comments. Holes agreed that the north patio was inadequate for their expressive activities, as there were few students and no tables and chairs. McGlone went back inside the University Center and spoke to Ed Boucher, Dean of Student Affairs. McGlone explained why he and Holes did not want to use the north patio, and he asserted that their use of the south patio/plaza area would in no way cause a disruption. Dean Boucher said that he would check university policy and get back to McGlone.

McGlone then returned to the south patio outside the University Center, where he and Holes, without permission, continued to distribute tracts and engage others in conversation. A few minutes later, TTU police officer Michael Lambert approached and informed McGlone and Holes that they had to stop their activities and leave campus or they would be arrested for trespass. McGlone and Holes left the campus.

The following day, on April 8, 2009, at approximately 9:00 a.m., McGlone telephoned Dean Boucher to find out whether he could speak on campus. Dean Boucher said that plaintiff could speak, but he needed to follow TTU's campus use policy. (Docket No. 2-19, Ex. T.) According to Dean Boucher, the policy required plaintiff to submit a written application before speaking (Docket No. 2-20, Ex. U) and to submit that application in person at least 14 business days prior to speaking.

The policy, entitled "Use of Campus Property And Facilities," states that its purpose "is to provide a uniform basis upon which the institutions and area vocational-technical schools governed by the Tennessee Board of Regents can regulate the use of campus property and facilities by affiliated and non-affiliated groups, organizations and individuals." (Docket No. 2- 19 at 1, 0240-1-1.01.) The policy also provides that it

> is intended to provide a system of regulations calculated to promote the orderly conduct of activities on campus property and in campus facilities: to prevent interruption of or interference with normal missions, processes and functions of the institutions and schools; to promote an educational rather than commercial atmosphere on campus; to prevent commercial exploitation of students; to preserve residential tranquility and to prevent use of campus property and facilities contrary to federal, state, or local law or regulation, or policies or regulations of the Tennessee Board of Regents, or the institution and schools.

(*Id.*) The policy further provides that the campuses and facilities of the institutions and schools are restricted to students, faculty, staff and guests of the institutions or schools, except when part or all of the campuses, its buildings or facilities are open to the general public for a designated time and purpose or "when use by non-affiliated groups, organizations or individuals has been granted or approved pursuant to the provisions of this policy or the policy of the individual institution or school." (*Id.* at 1, 0240-1-1.02(2)(a).) The policy specifically states that "[n]on-affiliated groups, organizations and individuals may utilize campus property and facilities on a temporary basis for the purpose of religious worship or evangelical activities subject to the specified registration requirements and procedures." (*Id.* at 5, 0240-1-1.04.)

The policy requires all non-affiliated individuals, groups, or organizations desiring use of campus property or facilities or desiring to distribute literature on campus to submit a written application for

registration of the proposed activity at least fourteen (14) days in advance (excluding weekends and holidays) to the appropriate official at the institution or school. (*Id.* at 2, 0240-1-1.02(4)(b).) In the event an applicant misses the 14-day advance notice deadline, "the President of the institution or director of the area school, or his or her designee, may approve applications for registration filed at a later time upon such official's determination that the use of property requested can be reasonably accommodated and that adequate cause exists for late filing of the application for registration." (*Id.*) Approval of a late application is within the sole discretion of the President, the director of the area school, or his or her designee. Applications must be submitted on a designated form. (*Id.*)

The policy permits officials to deny applications for use of campus property in nine (9) specific circumstances: (1) where the requested use would cause substantial disruption or interference with the normal activities of the institution or school conducted in the course of its lawful mission, processes and functions; (2) the requested use would be contrary to federal, state, or local law or regulation, or policies or regulations of the Tennessee Board of Regents, or the institution or school; (3) the applicant or sponsor failed to provide accurate and complete information on the application for registration; (4) the applicant or sponsor has been responsible for policy violations during previous registered use of campus property or facilities; (5) approval for the use of property or facilities has previously been given to another group, organization or individual for the time(s) and location(s) requested; (6) use of the property or facilities requested would be impossible due to the set-up time and/or take down time required for other previously scheduled activities at the requested location immediately before and/or after the requested use, or due to other extenuating circumstances; (7) the activity is of such nature or duration that it cannot reasonably be accommodated in the particular area for which application is made, provided that in such event, an alternative on campus site, if available for the activity, may be proposed by the institution or school; (8) the activity creates or would create a danger, or dangerous condition impacting on the health, safety, and welfare of others; and (9) such use conflicts or would conflict with existing contractual obligations of the institution or school. If an application is denied for a reason stated in paragraphs (1), (2), (4), (7), (8), or (9), the applicant has a right to appeal the denial to the President or area school director or his or her designee. (*Id.* at 4, 0240-1-1.03(e).)

Plaintiff McGlone, believing this policy burdensome on speech, requested to talk to Dean Boucher about his concern in person. McGlone did not complete the application required by the policy, and Dean Boucher refused to meet with him.

Later on April 8, 2009, McGlone met with Holes, and they decided not to return to TTU's campus because they did not want to submit an application and wait for 14 days. Instead, they went to a location that they thought was off TTU's campus, about 150 feet north of the intersection of Dixie Avenue and 9th Street. (Docket Nos. 2-17 & 2-18, Exs. R & S.) This area looked to them like a city sidewalk, and they claim that they believed it to be a city sidewalk. Upon arrival, they began talking to people, displaying signs, and distributing literature. Approximately 15 minutes after their arrival, Dean Boucher approached McGlone and Holes and advised them that they could not speak on that sidewalk without university permission because the sidewalk was on university property.

McGlone has not returned to TTU's campus since this incident, he says for fear of arrest. He asserts that TTU's campus use policy serves to chill and deter his expression and that many of the provisions adversely affect his speech. TTU requires him, as an individual speaker or as part of a small group, to apply in person and to supply 14 business days advance notice of his desire to speak. The plaintiff claims that this requirement affects his message because he does not necessarily know where he will be 14 business days in advance. Weather could dictate a sudden change in schedule. Also, he often likes to speak to the issues of the day, which requires him to be spontaneous. He claims that the notice requirement eliminates spontaneity and that he sees no good reason for this requirement.

The TTU application requires any outside speaker to identify a program title and purpose, state whether literature will be distributed, and state whether the speaker qualifies as an assembly, political or religious. The plaintiff claims that these requests deter him because he does not want to divulge personal information like this just to share his beliefs. He is afraid that the information will be used to discriminate against him.

Based on the language of the campus use policy, TTU specifically allows individuals unaffiliated with the university, like the plaintiff, to speak on campus, but the policy does not specify where the plaintiff can speak or how long he can speak. The plaintiff believes that TTU officials used this "open-ended discretion" to discriminate against him and his particular message by placing him in an isolated area like the north patio, "where no one ever goes." If not for the campus use policy and the actions of the defendants, the plaintiff claims that he would immediately return to TTU to share his message.

On June 23, 2009, counsel for the plaintiff sent a six-page letter to TTU President Dr. Robert Bell, Dean Boucher, and Police Chief Gay Shepherd, outlining the legal reasons why plaintiff believed his First

Amendment rights had been violated. (Docket No. 2-21.) On July 22, 2009, an Associate General Counsel with the Tennessee Board of Regents sent a responsive letter to plaintiff's counsel. (Docket No. 2-22.) The letter stated in part:

> As you appear to be aware, TTU may impose reasonable time, place and manner restrictions pertaining to the property under its control. TTU may restrict access to its property and facilities in a manner consistent with its pedagogical mission in order to prevent interruption of or interference with normal missions, processes and functions of the institution. To that end, TTU has in place a policy and process which it consistently applies in a viewpoint-neutral manner allowing affiliated and non-affiliated groups, organizations and individuals the ability to request use of campus property and facilities. Courts have consistently held as constitutional, policies and practices similar to those in place at TTU. TTU welcomes freedom of expression and speech on its campus. If Mr. McGlone wishes to utilize the TTU campus to share his religious beliefs with students and staff, and to distribute literature, he must first follow the appropriate procedure and fill out an application not later than 14 days prior to the date of his requested use. Should he fail to do so, he will be denied access to the campus.

On March 29, 2010, McGlone filed suit in this court under 42 U.S.C. § 1983 against Dr. Bell, in his official capacity as President of TTU, and against Dean Boucher, Ochsenbein, and Officer Lambert in their official and individual capacities, seeking declaratory and injunctive relief and nominal damages. In his first cause of action for violation of the Free Speech Clause of the First Amendment, plaintiff alleged that his religious speech is protected speech under the First Amendment and that TTU's policy and practices, and enforcement thereof, including but not limited to TTU's campus use policy, are vague and overbroad; restrain constitutionally- protected speech in advance of its expression, without appropriate guidelines or standards to guide the discretion of officials charged with enforcing the policy; chill the free speech and free exercise of religion of plaintiff and of other third-party citizens; allow the exercise of unbridled discretion; are not narrowly tailored to achieve any legitimate government purpose; and fail to leave open alternative avenues for expression. He also alleged that defendants have no compelling or legitimate reason to justify their "censorship" of the religious viewpoints sought to be expressed by plaintiff.

In the second cause of action, for violation of the Due Process Clause of the Fourteenth Amendment, plaintiff alleged that defendants' policies are vague and lack sufficient objective standards to curtail the discretion of officials and that this allows defendants ample opportunity to enforce the policies in an *ad hoc*, arbitrary, and discriminatory manner. Plaintiff alleged that defendants have no compelling or legitimate reason to justify their vague policies.

In the motion for a preliminary injunction, plaintiff asks the court to enjoin the defendants and their agents, servants, employees, attorneys, and all persons and entities in active concert or participation with them, directly or indirectly, from applying the TTU campus use policy on its face and from applying the campus use policy to prevent plaintiff from engaging in his desired and constitutionally protected speech activities. In the absence of a preliminary injunction, plaintiff asserts that he will suffer irreparable injury in the loss of his rights and freedoms guaranteed by the United States Constitution.

R. 29, Mem., at 2-11.

The district court found that Plaintiff lacked standing to bring the claim and dismissed the Complaint with prejudice. *Id.* at 17. The district court reasoned that since Plaintiff's claim was nothing more than a subjective "chill" of his First Amendment rights, it was insufficient to confer standing. *Id.* at 14 (citing *Morrison v. Bd. of Educ.*, 521 F.3d 602, 608 (6th Cir. 2008)). Consequently, the district court also denied the motion for preliminary injunction and dismissed all Defendants in their individual and official capacities. *Id.* at 18-20; R. 30, Order; R. 35, Order. The court also found that the campus use policy is content-neutral, narrowly tailored to serve significant government interests, and left ample alternative channels for communication. R. 29, Mem., at 15-17.

## STANDARD OF REVIEW

This consolidated appeal arises from the district court's orders granting Defendants' motion to dismiss and motion for judgment on the pleadings.[2] "Motions

---

[2]Defendants filed an untimely motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), as it was filed after Defendants' Answer. The district court, using its discretion to address substance over form, treated Defendants' motion to dismiss as a 12(c) motion for judgment on the pleadings. R. 35, Order, at 1-2 (citing *Satkowiak v. Bay Cnty. Sheriff's Dep't*, 47 F. App'x 376, 377 n.1 (6th Cir. 2002)).

for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) are analyzed under the same *de novo* standard as motions to dismiss pursuant to Rule 12(b)(6)." *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008) (internal citation omitted). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal citations and quotations omitted). A motion to dismiss for failure to state a claim is disfavored, especially when one's civil rights are at stake. *Nuchols v. Berrong*, 141 F. App'x 451, 453 (6th Cir. 2005) (unpublished); *see Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir. 1976).

A dismissal for lack of standing is also reviewed *de novo*. *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 348 (6th Cir. 2007) (internal citation omitted).

In general we review a district court's denial of a motion for preliminary injunction for abuse of discretion. *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996). When reviewing a preliminary injunction with First Amendment implications, however, the review is *de novo*. *Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002) (internal citation omitted). No deference is afforded to the district court. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984).

## DISCUSSION

The district court held that McGlone did not have standing. In the alternative, it held that TTU's policy was a content-neutral, time, place, and manner regulation warranting dismissal of the complaint. Both prongs–standing and dismissal–will be discussed below.

STANDING

The district court found that "plaintiff did not submit proof of any concrete and particularized harm that is actual and imminent, and he alleges nothing more than a

subjective 'chill' of his First Amendment rights." R. 29, Mem., at 14. Upon a *de novo* review of the record, we find that the district court erred in making such a determination. McGlone has satisfied the constitutional and prudential standing requirements to bring his First Amendment claims for the reasons stated below.

Standing to pursue a claim is a threshold question in every federal case. *Warth v. Seldin*, 422, U.S. 490, 498 (1975). "The burden of establishing standing is on the party seeking federal court action." *Rosen v. Tenn. Comm'r of Fin. & Admin.*, 288 F.3d 918, 927 (6th Cir. 2002) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). A plaintiff must meet Article III and prudential standing requirements to proceed with his case. *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 793 (6th Cir. 2009).

To establish Article III, constitutional standing, a plaintiff must show:

(1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id*. (quoting *Am. Civil Liberties Union of Ohio, Inc. v. Taft*, 385 F.3d 641, 645 (6th Cir. 2004)). To establish prudential standing requirements

(1) a plaintiff must assert his own legal rights and interests, without resting the claim on the rights or interests of third parties; (2) the claim must not be a 'generalized grievance' shared by a large class of citizens; and (3) in statutory cases, the plaintiff's claim must fall within the 'zone of interests' regulated by the statute in question.

*Id.* (quoting *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999)).

Most factors as to standing are clearly met by McGlone, as there are limited factual disputes in this case. The alleged injury is fairly traceable to Appellees, as TTU's policy was created and enforced by the school and its officials. His alleged injury will be redressed by a favorable decision. He is asserting his own legal rights and interests; he is the one who wants to speak on campus. Since it is personal to him, it is not a "generalized grievance" and it falls with the zone of interests regulated by the

statute—his right to free speech.  The only factor as to standing that is in dispute is whether McGlone has suffered an injury in fact, which is discussed in detail below.

      1.      <u>Injury in Fact</u>

Plaintiff is challenging four aspects of the TTU campus use policy:

1)      the provision which requires individuals and small groups to obtain permission before speaking on campus fourteen business days in advance (R. 2-19, Ex. T, at § 2(4)(b));

2)      the provision requiring speakers to disclose personal information, including the content of their message, before speaking on campus (R. 2-19, Ex. T, at § 2(4)(b); R. 2-20, Ex. U, Application);

3)      the waiver provision which allows TTU officials to waive or enforce the advance notice requirement ((R. 2-19, Ex. T, at § 2(4)(b)); and

4)      the absence of a provision limiting the discretion of the TTU officials' choice of where and how long a speaker may speak on campus (R. 2-19, Ex. T).  Appellant's Br., at 14.

"It is well-settled that a chilling effect on one's constitutional rights constitutes a present injury in fact." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1076 (6th Cir. 1994) (internal citation omitted).  To show the existence of an objective chill, a plaintiff must show that he has an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder . . ." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *accord Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1394-96 (6th Cir. 1987).  Plaintiffs may have standing even if they have never been prosecuted or threatened with prosecution. *Doe v. Bolton*, 410 U.S. 179, 188 (1973).

Plaintiff is not required to "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see also Planned Parenthood*,

822 F.2d at 1395-96.  With regard to a plaintiff's First Amendment rights, the Supreme Court has held that:

> when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law  may challenge it facially without the necessity of first applying for, and being denied, a license.

*City of Lakewood v. Plain Dealer Publ'n Co.*, 486 U.S. 750, 755-56 (1988); *see also East Brooks Books, Inc.v. Shelby Cnty. Tenn.*, 588 F.3d 369 (6th Cir. 2009) (finding that plaintiff had standing based on the suppression of his future protected speech even where his license was not actually revoked).

The district court accepted Appellees' argument that because McGlone did not apply for a permit, he did not suffer an injury in fact.  Appellees rely heavily on the Sixth Circuit case of *Morrison v. Board of Education* and claim that McGlone has only shown a subjective chill of his First Amendment rights.  *See Morrison v. Bd. of Educ.*, 521 F.3d 602 (6th Cir. 2008).

In *Morrison*, we held that subjective chill alone is insufficient to establish standing.  *Morrison*, 521 F.3d at 608.  Morrison was a high school student and Christian who believed that his religion required him to tell homosexual students that their sexual orientation was a sin.  *Id.* at 605.  His high school had a written policy prohibiting students from making potentially harassing or derogating statements to students based on their sexual orientation.  Morrison alleged that the written policy chilled his speech because he was scared of being punished.  *Id.*  After filing his lawsuit, the school board changed the policy to permit anti-homosexual speech unless it was "sufficiently severe or pervasive that it adversely affects a student's education or creates a climate of hostility or intimidation for that student, both from the perspective of an objective educator and from the perspective of the student at whom the harassment is directed."  *Id.* at 607.

The Court held that Morrison did not have standing.  *Id.* at 608.  The Court reasoned that "the record [was] silent as to whether the school district threatened to

punish or would have punished Morrison for protected speech in violation of its policy." *Id.* The Court declined to find standing where Morrison's claim was based solely on apprehension and without any specific action by the Board that supported his fear that punishment would result. Morrison's reliance on the written policy by itself was held to be insufficient. *Id.*

Here, the district court imposes the requirement that McGlone apply for and be denied a permit to speak before he is afforded standing. The law does not support such a result. *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see also Planned Parenthood*, 822 F.2d at 1395-96.

McGlone's intention to engage in expression regulated by TTU's policy is sufficient to support his assertion that the policy objectively chills his desired speech. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *accord Planned Parenthood*, 822 F.2d at 1394-96. McGlone has a desire to speak spontaneously on TTU's campus in areas that are subject to the policy. The fact that McGlone can speak freely on the north patio does not affect his standing to bring the instant claim. *See Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 607 (6th Cir. 2005) (allowing plaintiff to challenge notice/permit provision even though the city of Dearborn has provided ample alternative means of communication such as the city hall and public parks).

This case is distinguishable from *Morrison*. Here, the record is not "silent" as to a threat of punishment. McGlone is alleging more than the apprehension based on a written policy. McGlone attempted to seek a waiver of the fourteen-day notice requirement by speaking in the south patio/plaza area of the campus. He was denied the waiver and was told that he could only speak on the north patio. Furthermore, he was approached by a campus police officer who threatened to arrest him for trespass if he did not stop speaking and leave the campus. Appellees also sent a letter to McGlone notifying him that he would not be allowed on campus if he did not first obtain permission. We hold that McGlone has suffered an injury in fact that is concrete and particular. He was not allowed to speak on campus and was not afforded a waiver. His

First Amendment rights have also been objectively chilled by the threat of arrest. The injury is actual, as it already occurred and will imminently occur again if he violates the policy.

We hold that McGlone has standing to challenge the policy on its face and as-applied to him. The district court erred in holding otherwise.

DISMISSAL

At the district court, Appellees filed a motion to dismiss for failure to state a claim and Appellees also moved to dismiss defendants in their individual capacities based on immunity. R. 13, Defs.' Mot. to Dismiss; R. 14, Defs.' Mem. in Supp. of Mot. to Dismiss. The district court ruled that TTU's policy was a permissible, content-neutral, time, place, and manner restriction warranting dismissal. The district court also dismissed the TTU officials in their individual capacities based on qualified immunity. These decisions were erroneous.

1.        Whether Appellant Brings a Claim for Which Relief Can Be Granted

This Court reviews a grant of a motion to dismiss for failure to state a claim *de novo*. *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005). "In determining whether a party has failed to state a claim, we construe the complaint in the light most favorable to the non-moving party and accept all factual allegations as true. *Id.* The complaint "need contain only 'enough facts to state a claim to relief that is plausible on its face.'" *Paige v. Coyner*, 614 F.3d 273, 277 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Forum analysis is required to determine whether a restriction on speech violates the First Amendment. *Parks v. City of Columbus*, 395 F.3d 643, 647 (6th Cir. 1985); *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1995). We use a three-step process to determine: 1) whether the expressive activity deserves protection; 2) the nature of the forum, and 3) whether the justifications for exclusion from the relevant forum satisfy the requisite standard. *Saieg v. City of Dearborn*,

641 F.3d 727, 734-35 (6th Cir. 2011) (internal quotations and citations omitted); *Cornelius*, 473 U.S. at 797.

### A.     Whether the Expressive Activity Is Protected

As to the first factor, McGlone's desire to share his religious message through public speaking, one-on-one conversation, distribution of literature, and display of signs is protected First Amendment activity. *See, e.g.*, *Boos v. Barry*, 485 U.S. 312, 318 (1988) (holding that the display of signs as protected speech); *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647 (1981) (holding that written and oral dissemination of religious viewpoint are protected speech); *Murdock v. Com. of Pa.*, 319 U.S. 105, 108 (1943) (holding that the hand distribution of religious materials are protected speech).

### B.     The Nature of the Forum

The district court declined to make a decision on whether the areas on TTU's campus are traditional public fora or designated public fora. R. 29, at 14, n.2 ("[T]he court need not resolve this issue because the standard applicable to traditional public fora and designated public fora is the same."). We, however, hold that this issue is now ripe for review, as no facts are in dispute. The issue is purely a question of law.

McGlone argues that the open areas on TTU's campus are public fora. We agree. The perimeter sidewalks along TTU's campus are traditional public fora and all other open areas are designated public fora.

There are three types of property for the purposes of forum designation: traditional, designated, and nonpublic fora. *Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834, 842 (6th Cir. 2000) (internal citations omitted). "Traditional public fora, such as streets, sidewalks, and parks, are 'places which by long tradition or by government fiat have been devoted to assembly and debate.'" *Id.* (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). In a designated public forum, the government "intentionally open[s] a nontraditional public forum for public discourse." *Id.* (quoting *Cornelius*, 473 U.S. at 802).

(i)     Perimeter Sidewalks

Appellant would like to speak on the perimeter sidewalks along the side of the TTU campus. Appellant argues that the sidewalks should be characterized as traditional public fora. Sidewalks have long been considered "prototypical" examples of traditional public fora. *Schenck v. Pro-Choice Network of W. New York*, 519 U.S. 357, 377 (1997). The burden is on TTU to show that the sidewalk is overwhelmingly specialized to negate its traditional forum status. *Henderson v. Lujan*, 964 F.2d 1179, 1182 (D.C. Cir. 1992).

Appellees have not attempted to dispute Plaintiff's characterization of the perimeter sidewalks as traditional public fora. McGlone argues that the sidewalks on TTU's campus "look like, lie adjacent to, and blend in with other city sidewalks." Appellant's Br., at 27. Where a private "[s]idewalk blends into the urban grid, borders the road, and looks just like any public sidewalk" the Court has characterized such a sidewalk as a traditional public forum. *United Church of Christ v. Gateway Econ. Dev. of Greater Cleveland, Inc.*, 383 F.3d 449 (6th Cir. 2004); *see also United States v. Grace*, 461 U.S. 171, 180 (1983) (holding that the sidewalk serving as a perimeter to the Supreme Court's grounds is a traditional public forum where there is no separation, fence, or indication that it is "some special type of enclave."); *see also Brister v. Faulkner*, 214 F.3d 675 (5th Cir. 2000) (finding that a university sidewalk that was physically indistinguishable from nearby city sidewalks is a traditional public forum). Because the perimeter sidewalks at TTU blend into the urban grid and are physically indistinguishable from public sidewalks, they constitute traditional public fora.

(ii)    Open Areas

The parties and the district court agree that the remaining open areas of the TTU campus are designated public fora. TTU's written policy states "[t]he campuses and facilities of" TTU to "non-affiliated groups, organizations or individuals" who have "been granted or approved pursuant to the provisions of this policy . . . ." R. 2-19, Ex. T, Policy, § 2(2)(a). The other open areas at issue are designated fora. *See Putnam Pit*, 221 F.3d at 842 (finding a designated public forum where the government "intentionally open[s] a nontraditional public forum for public discourse").

C.      Whether the Justifications for Exclusion from the Relevant
Forum Satisfy the Requisite Standard

A prior restraint is any law "forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993). TTU's policy requires unaffiliated speakers to "submit a written application for registration of the proposed activity at least fourteen (14) days in advance (excluding weekends and holidays) . . ." R. 29, Ex. T. Because an unaffiliated speaker's exercise of a First Amendment right depends on the prior approval of a public official, the policy imposes a prior restraint. *See Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001).

"Any system of prior restraints of expression [bears] a heavy presumption against its constitutional validity, and a party who seeks to have such a restraint upheld thus carries a heavy burden of showing justification for the imposition of such a restraint." *Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d at 477, 485 (6th Cir. 2002) (quoting *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971)). A prior restraint must be content-neutral, narrowly tailored to serve a significant governmental interest, and leave open alternatives for communication. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). Furthermore, it must not delegate overly broad licensing discretion to official decision-makers. *Id.*

TTU's campus policy violates the First Amendment because the policy is not narrowly tailored to any legitimate interest.

Appellant argues that 1) the fourteen business day advance notice requirement, 2) the requirement that speakers obtain permission to engage in any form of expression, and 3) the requirement that the speakers must disclose their identity and content of speech "burden substantially more speech than is necessary to further the government's legitimate interests." Appellant's Br., at 30 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)).

(i)       Advance Notice Period and Permission to Engage in Expression

"Any notice period is a substantial inhibition on speech." *Dearborn*, 418 F.3d at 605. "The simple knowledge that one must inform the government of his desire to speak and must fill out appropriate forms and comply with the applicable regulations discourages citizens from speaking freely." *N.A.A.C.P. v. City of Richmond*, 743 F.3d 1346, 1355 (9th Cir. 1984).

TTU's fourteen business day notice period is much longer than other notice periods that have been upheld. *See Bowman v. White*, 444 F.3d 967 (8th Cir. 2006) (upholding a three day advance notice period)); *see Sonnier v. Crain*, 613 F.3d 436 (5th Cir. 2010) (upholding a seven day advance notice period)). Appellees have not provided any explanation for the need of a fourteen business day notice period. In fact, at oral argument, Appellees agreed that the period was unreasonable.

Appellees have not met their burden to show that the restriction is narrowly tailored to serve a significant government interest. *See N.A.A.C.P.*, 743 F.2d at 1356-57 (finding it insufficient to "simply assert[], without citation to authority, that 20 days notice" is narrowly tailored). We hold that TTU's notice period is unreasonable. *See, e.g.*, *City of Dearborn*, 418 F.3d at 606-07 (invalidating a thirty-day advance notice requirement for events in parks, on streets, and in other public areas); *Douglas v. Brownell*, 88 F.3d 1511, 1523-24 (8th Cir. 1996) (invalidating a five-day advance notice requirement for processions of ten or more persons on streets, sidewalks, and public ways); *Grossman v. City of Portland*, 33 F.3d 1200, 1204-07 (9th Cir. 1994) (invalidating a seven-day advance notice requirement to demonstrate in a public park); *Roberts v. Haragan*, 346 F. Supp. 2d 853, 868-69 (N.D. Tex. 2004) (invalidating a two-day advance notice requirement for students to speak in designated campus areas).

(ii)      Disclosure of Identity and Content of Speech

As a general matter, anonymous speech is protected by the First Amendment. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995); *see also Buckley v. Am.*

*Constitutional Law Found., Inc.*, 525 U.S. 182, 199-200 (1999); *Talley v. California*, 362 U.S. 60, 64 (1960). Registration requirements dissuade potential speakers by prohibiting anonymous speech. *See Watchtower Bible*, 536 U.S. at 166; *see also McIntyre*, 514 U.S. at 341-42 ("[A speaker's] decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible."); *see also Berger v. City of Seattle*, 569 F.3d 1029, 1037-38 (9th Cir. 2009).

Appellant argues that TTU's permit, which requires individuals and small groups to submit information about their identity and about the program purpose is an unconstitutional restriction. Appellant's Br., at 38-40. TTU's form asks for the "Program Purpose." *Id.*; R. 2-20, Ex. U. The form asks for the name and topic of the speaker. *Id.* It also requires an applicant to indicate whether the speech is "political" or "religious." *Id.*

Appellant argues that the only reason TTU requires such information is to discriminate on the basis of content, specifically to deny applicants or raise security costs in anticipation of the concerns about a given message. Appellant's Br., at 39. Appellant argues that there is no reason for TTU to inquire as to whether a message is "religious" or "political." *Id.* Appellant claims that he is hesitant to disclose such information and would like to engage in anonymous speech. *Id.* at 40.

Appellees do not address this argument directly. Appellees' only response is that "[t]he campus use application form to be completed by the individual or group seeking to utilize campus property is also narrowly tailored to require only that amount of information necessary to serve the significant interests of TTU in maintaining order and preventing interruption of its educational mission." Appellees' Br., at 16.

Here, Appellees have failed to meet their burden in defending the policy. Appellees have not specified the "significant interests," nor have they elaborated on an "educational mission." They have not explained how the policy at issue maintains order or prevents interruption of an educational mission. Appellees have failed to show that

the policy is narrowly tailored.   We reverse the district court's decision to grant dismissal as to this issue and remand for further proceedings consistent with this opinion.

### (iii)        Whether the Policy Allows Unbridled Discretion

Appellant also argues that the campus use policy's discretionary waiver policy is unconstitutional.  The policy identifies nine specific circumstances in which a permit may be denied.  R. 2-19, Ex. T, § 2(4)(d).  The policy, however, allows officials to waive the fourteen business day waiting period for any reason.  In light of the invalidity of the notice period, as discussed *supra*, we reverse the dismissal of this claim and remand for further proceedings consistent with this opinion.

### QUALIFIED IMMUNITY

The district court erroneously dismissed the TTU officials in their individual capacities based on their qualified immunity.  R. 29, Mem., at 20.  Appellant has correctly and adequately addressed this issue in its brief. Appellant's Br., at 44-45, n.18. Appellant argues:

> The qualified immunity inquiry asks two distinct questions: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008). For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right. *Harris v. City of Circleville*, 583 F.3d 356, 366-67 (6th Cir. 2009). To make this assessment, this Court looks to decisions of the Supreme Court, its own decisions, and finally to decisions of other circuits. *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991). There need not be a prior case directly on point for a law to be clearly established; generalized statements of the law or a general constitutional rule already identified in the decisional law are sufficient. *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010). As established herein, McGlone had a clearly established right to engage in his desired expression free from the unconstitutional requirements imposed by TTU. Therefore, the District Court's ruling with respect to qualified immunity should . . . be reversed.

*Id.* We agree. We reverse the district court's decision to dismiss the TTU officials based on qualified immunity.

PRELIMINARY INJUNCTION

When evaluating a motion for preliminary injunction, we must consider four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Bonnell*, 241 F.3d at 809 (quoting *Rock & Roll Hall of Fame v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998)).

In light of the above, we vacate the district court's denial of McGlone's preliminary injunction motion and remand for further proceedings consistent with this opinion.

**CONCLUSION**

In summary, we **REVERSE** the district court's finding that Appellant does not have standing to pursue his claims; **REVERSE** the district court's grant of Defendants' motion to dismiss and **REMAND** for further proceedings consistent with this opinion; and **VACATE** the district court's denial of McGlone's motion for preliminary injunction and **REMAND** for further proceedings consistent with this opinion.